**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PROQUOTES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CDK GLOBAL, LLC,<br><br>Defendant. | Civil Action No. 25-16914 (SDW) (JBC)<br><br>**OPINION**<br><br>August 28, 2026 |

**WIGENTON**, District Judge.

Before this Court are Defendant CDK Global, LLC's ("CDK") Motion to Partially Dismiss (D.E. 16-1 "Motion to Dismiss") Plaintiff ProQuotes, Inc.'s ("ProQuotes") Complaint[1] (D.E. 1 ("Compl.")), pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), Motion for Preliminary Injunction to Enjoin Arbitration (D.E. 17-1 "Motion for Preliminary Injunction"), ProQuotes' Motion to Dismiss CDK's Counterclaims (D.E. 30-1 ("Motion to Dismiss Counterclaims")), and Motion to Compel Arbitration (D.E. 14-1 ("Motion to Compel")). Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction is proper under 28 U.S.C. § 1367. Venue is proper pursuant to the parties' forum selection clause. (Compl. ¶ 7.) This Opinion is issued without oral argument pursuant to Rule 78. For the reasons set forth herein, ProQuotes' Motion to Compel is **GRANTED** and its Motion to Dismiss Counterclaims is **GRANTED WITHOUT PREJUDICE**. CDK's Motion for Preliminary Injunction is **DENIED**

[1] ProQuotes filed its Complaint and Exhibits together in a single docket entry (D.E. 1). For the purposes of this Opinion, "Complaint" refers to pages 1–39 of D.E. 1.

and its Motion to Partially Dismiss the Complaint is **DENIED**, with Counts III, IV, V, VI, and VII reserved for arbitration.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. The Parties' Forms Programming Relationship

ProQuotes is a company that processes and programs Finance and Insurance forms ("FI forms") used by car dealerships during the final stages of a vehicle purchase. (Compl. ¶ 7.) In 2007, ProQuotes and CDK's predecessor, ADP[2], executed a services agreement ("2007 Agreement") under which ProQuotes would program impact and laser forms for ADP. (*Id.* ¶¶ 17–18.) The 2007 Agreement set payment at $75 per form and established a 300-form monthly minimum, provided ProQuotes was not at fault for producing fewer than 300 forms in a month. (*Id.* ¶ 22.) Despite extensive negotiation between ProQuotes' President, Philip Mooney ("Mooney"), and ADP's Director of Forms, Robert Watson ("Watson"), ADP immediately failed to make the monthly minimum payments; over the next few years, its payments were erratic, ranging from none to amounts closer to but still below the minimum. (*Id.* ¶ 56; D.E. 1 at 94.) In late 2010, ADP began giving ProQuotes business as originally intended and met the monthly minimum until 2015[3], when its adherence again became erratic. (D.E. 1 at 94.)

---

[2] In 2014, ADP announced the spin-off of its dealer services division into a new entity, CDK Global. *See* Separation and Distribution Agreement between Automatic Data Processing, Inc. and CDK Global Holdings, LLC, Ex. 2.1 (2014), available on the SEC website. As part of the spin-off, ADP and CDK agreed that CDK would assume specified liabilities of its predecessor, in accordance with the agreement's terms.

[3] In December 2012, during a period when ADP was consistently meeting the monthly minimum payment obligation, ADP approached ProQuotes about performing data extraction services. (Compl. ¶ 26.) ADP then sent ProQuotes a proposed SOW attached to the 2007 Agreement, but the parties never finalized this amended arrangement. (*Id.* ¶¶ 27–28.) As a result of this proposed, but unconsummated amendment, ADP began mistakenly referring to the 2007 Agreement as the 2012 Agreement, even though no agreement was executed on that date. (*Id.* ¶ 28.) This mislabeling continued into the 2013 Software License Agreement.

The 2007 Agreement remained in effect without changes until late 2020, when ProQuotes sought a price adjustment from CDK—ADP's successor—after CDK began sending ProQuotes increasingly complex forms. (Compl. ¶¶ 29–30.) On January 26, 2021, ProQuotes and CDK amended the 2007 Agreement ("Amended 2007 Agreement"), establishing different rates for the various types of forms that ProQuotes produced. (*Id.* ¶ 30.) Importantly, the Amended 2007 Agreement did not alter the parties' 300-form monthly commitment. (*Id.* ¶ 39.) This amended agreement was mistakenly labeled as an amendment to a 2013 agreement, even though the only agreement between the parties in 2013 was a Software License Agreement unrelated to the forms programming services between the parties. (*Id.* ¶¶ 33–34.) When ProQuotes attempted to correct the labeling error, CDK reported it could not locate an executed copy of the original 2007 Agreement. (*Id.* ¶¶ 35–36.) Watson then emailed Mooney a copy of the original 2007 Agreement, stating "Here you go, not the signed copy but this is what we signed." (*Id.* ¶ 37.)

The Amended 2007 Agreement governed the parties' forms programming relationship until 2024, when CDK asked ProQuotes to begin providing data conversion services. (*Id.* ¶ 45.) When ProQuotes requested that the new Statement of Work ("SOW") be attached to the Amended 2007 Agreement, CDK responded that it could only locate the 2013 License Agreement. (*Id.* ¶ 47.) On December 18, 2024, the parties entered into a new contract with two SOWs ("2024 Agreement"): one covering forms programming (substantively identical to the Amended 2007 Agreement and retaining the 300-form monthly minimum) and a second governing the new data conversion work. (*Id.* ¶¶ 48–52.) As before, CDK failed to satisfy its monthly minimum, and after ProQuotes raised this deficiency, CDK terminated the forms programming SOW under the 2024 Agreement. (*Id.* ¶¶ 53–55.)

B. <u>The Parties' Software Licensing Relationship and the FTP Server</u>

Historically, FI forms were printed primarily on "impact forms", which produced markings through physical contract with the paper. (*Id.* ¶ 8.) Over the past few decades, dealerships began to move away from impact forms and toward more modern "laser forms", which print faster, offer higher resolution, and are more easily customizable. (*Id.* ¶ 10.) As the industry shifted to laser forms, ProQuotes was increasingly required to undertake the slow and cumbersome process of converting impact form programming into laser form programming. To make that process more efficient, ProQuotes began developing proprietary software in the early 2010s, ultimately creating three software tools—which CDK later asked to license after observing the improved efficiency from the new software. (*Id.* ¶ 61.)

On October 31, 2013, the parties entered into a Software License Agreement ("2013 License Agreement"). (*Id.* ¶ 62.) The 2013 License Agreement provided that upon the termination, ADP would return all software, training materials, and other materials relating to the License. (*Id.* ¶ 74.) It also included a non-compete clause barring ProQuotes from licensing the Software to any CDK competitor and prohibiting CDK from providing access to the Software to any ProQuotes competitor. (*Id.* ¶ 75.)

To support its software and forms programming services for CDK, ProQuotes maintained a dedicated File Transfer Protocol ("FTP") Server and created a directory used solely to receive log files generated when CDK users encountered Software errors. (*Id.* ¶¶ 87–88.) When the Software encountered an error or crashed, it automatically transmitted a log file describing the issue to the FTP Server, but ProQuotes did not receive any notification when a log file was uploaded.

In October 2019, CDK terminated the License. (*Id.* ¶ 84.) ProQuotes had built a "kill switch" into the Software intended to render it unusable upon termination. (*Id.* ¶ 101.) Because CDK was the Software's only licensee and ProQuotes believed the Software would be non-functional and thus unable to generate or transmit additional log files, ProQuotes abandoned the CDK-dedicated directory on the FTP server. (*Id.* ¶ 94.)

C. Discovery of Copyright Infringement and Procedural History

After the License was terminated, ProQuotes continued performing forms programming work for CDK. (*Id.* ¶ 95.) By June 2022, CDK had significantly reduced the volume of work it sent to ProQuotes, prompting ProQuotes to downsize its CDK-dedicated team and return the CDK-owned computers it had been using to perform that work. (*Id.* ¶¶ 41, 96.) In August 2022, CDK returned to ProQuotes for additional forms programming work, which required CDK to send additional computers so ProQuotes could program forms within CDK's environment; those computers arrived on September 30, 2022. (*Id.* ¶¶ 96–97.) On that day, Matthew Islas ("Islas"), a ProQuotes employee and the developer of the software covered by the 2013 Software License Agreement, powered on the CDK computers and observed that they still contained ProQuotes software. (*Id.* ¶¶ 99–100.) Islas opened each ProQuotes program and was surprised to find it still functioning, as he believed the kill switch would have activated upon termination. (*Id.* ¶ 101.) He documented his observations by video and as part of that documentation, opened the hard drive directory, which displayed a "ProQuotes" folder containing three subfolders, each containing ProQuotes software. (*Id.* ¶¶ 102–110.)

On June 17, 2025, ProQuotes sent CDK a demand letter seeking compensation for breach of contract, copyright infringement, and Digital Millennium Copyright Act ("DMCA") violations.

(*Id.* ¶ 126.) CDK responded on August 21, 2025, denying liability and asserting that ProQuotes was not permitted to conduct a "forensic examination" of CDK's computers. (*Id.* ¶¶ 129–130.)

On October 24, 2025, ProQuotes filed its Complaint against CDK and later moved to compel arbitration on December 12, 2025. (*See* D.E. 1, 14.) On December 15, 2025, CDK moved to partially dismiss the Complaint, filed an Answer with counterclaims, and moved for a preliminary injunction to enjoin arbitration. (*See* D.E. 15, 16, 17.) On January 13, 2026, ProQuotes moved to dismiss the counterclaims, and timely briefing ensued on all four Motions. (*See* D.E. 30.)

## II. LEGAL STANDARD

### A. Motion to Compel Arbitration

The FAA was enacted to ensure the enforcement of private arbitration agreements. *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 344 (2011); 9 U.S.C. § 2 (providing that written arbitration agreements "shall be valid, irrevocable, and enforceable"). Before compelling arbitration under the FAA, a court must determine that: "(1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of the agreement." *Saleh v. Udemy, Inc.*, No. 23-02207, 2024 WL 1231343, at *2 (D.N.J. Mar. 21, 2024) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009)). The first question, referred to as a gateway question of arbitrability, is typically resolved in court, unless the parties have clearly and unmistakably provided otherwise. *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 215 (3d Cir. 2019) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002); *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 756 (3d Cir. 2016)).

In determining whether a valid arbitration agreement exists, courts apply either the Rule 12(b)(6) or Rule 56 standard. *Saleh*, 2024 WL 1231343, at *3 (citing *Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 117 (3d Cir. 2015)). When arbitrability is apparent on the face of the complaint, the Rule 12(b)(6) motion to dismiss standard applies. *Id.* If arbitrability is not apparent from the pleadings, the court applies the summary judgment standard under Rule 56. *Id.* Even when the complaint does not expressly reference the arbitration agreement, Rule 12(b)(6) may still govern when applying that standard is consistent with the FAA's goal of efficient dispute resolution. *Id.* (quoting *Benedict v. Guess, Inc.*, No. 20-4545, 2021 WL 37619, at *4 (E.D. Pa. Jan. 5, 2021)). Thus, when a contract containing the arbitration provision is integral to the plaintiff's claims and the nonmoving party offers no competing evidence, courts apply the Rule 12(b)(6) standard. *See id.* Here, although the arbitration agreement is not a part of ProQuotes' Complaint, it is integral to its claims. Accordingly, the Rule 12(b)(6) standard applies.

B. Motion for Preliminary Injunction to Enjoin Arbitration

When deciding whether to grant a preliminary injunction under Rule 65, courts consider whether the movant has demonstrated: (1) a likelihood of success on the merits; (2) irreparable harm if the injunction is denied; (3) that the balance of harms favors the movant; (4) public interest weighs in favor of the injunction. *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (quoting *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010)). Irreparable harm exists when a party is forced to arbitrate a claim they did not agree to arbitrate. *Fedway Assocs., Inc. v. Wine, Liquor & Distillery Workers' Union Loc. 1-D, UCFW*, No. 21-19604, 2022 WL 4536278, at *5 (D.N.J. Sept. 28, 2022)).

C. Motion to Dismiss

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Determining whether allegations are plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When deciding a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted, federal courts "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff," and determine "whether [the] plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichik*, 605 F.3d 223, 229 (3d Cir. 2010). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to show "that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "[L]abels and conclusions" or a "formulaic recitation of the elements of a cause of action" are insufficient to withstand a motion to dismiss. *Twombly*, 550 U.S. at 555.

## III. DISCUSSION

### A. ProQuotes' Motion to Compel Arbitration and CDK's Motion for Preliminary Injunction to Enjoin Arbitration

#### i. The gateway questions of arbitrability

Under the FAA, arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63,

68 (2019) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). New Jersey law presumes that a court, not an arbitrator, decides issues of arbitrability but parties may agree to have an arbitrator decide not only the merits of the underlying dispute but also the "gateway" questions of arbitrability. *Id.* (citing *Rent-A-Ctr., W., Inc.*, 561 U.S. at 68–69)). A delegation clause authorizes an arbitrator to decide even the threshold questions of whether the parties' dispute is subject to arbitration. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 112 (2019) (citing *Rent-A-Ctr., W., Inc.*, 561 U.S. at 68–69)). Generally, incorporation of the American Arbitration Association's ("AAA") Rules constitutes a delegation clause because the AAA Rules empower the arbitrator to decide his or her own jurisdiction. *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020). However, even when a valid delegation clause exists, the court retains authority to decide whether the parties formed a valid agreement to arbitrate, as a delegation clause is simply a specialized type of arbitration agreement. *Adler v. Gruma Corp.*, 135 F.4th 55, 66 (3d Cir. 2025) (quoting *New Prime Inc.*, 586 U.S. at 106)); *Henry Schein, Inc.*, 586 U.S. at 69 ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.)

Here, the arbitration provision in question contains a valid delegation clause because it expressly incorporates the AAA Rules, stating that "The matter shall be submitted for arbitration in accordance with the rules of the American Arbitration Association in effect at the time of arbitration." (D.E. 1 at 47–48.) Courts in this District have consistently held that similar language incorporating the AAA Rules constitutes a delegation of arbitrability issues to the arbitrator. *See Carrone v. UnitedHealth Grp. Inc.*, No. 20-5138, 2020 WL 4530032, at *2 (D.N.J. Aug. 6, 2020); *Romanov v. Microsoft Corp.*, No. 21-03564, 2021 WL 3486938, at *5 (D.N.J. Aug. 9, 2021); *Cabrera v. Verizon*, No. 24-7780, 2024 WL 4818091, at *4 (D.N.J. Nov. 18, 2024). Even so, this Court retains authority to decide whether the parties formed a valid agreement to arbitrate, as CDK

has specifically challenged the validity of the arbitration agreement in its opposition to the Motion to Compel. (D.E. 20 at 15–21.) Accordingly, this Court will address whether a valid agreement to arbitrate was formed and will leave any remaining arbitrability issues—including whether particular claims fall within the scope of the arbitration agreement—to the arbitrator.

ii. Whether the parties formed a valid agreement to arbitrate

In New Jersey, public policy strongly favors arbitration as a means of dispute resolution. *Salvadori v. Option One Mortg. Corp.*, 420 F. Supp. 2d 349, 355 (D.N.J. 2006). When a contract contains both an arbitration clause and a forum selection clause that appear to be in tension, courts first seek to reconcile the provisions and construe the contract in a way that harmonizes them. *Singh v. Uber Techs., Inc.*, 67 F.4th 550, 563 (3d Cir. 2023). In doing so, courts may not adopt an interpretation that renders any other provision superfluous. *New Castle Cnty., Del. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 174 F.3d 338, 349 (3d Cir. 1999). Courts commonly resolve apparent conflicts by reading the forum selection clause as identifying the proper venue for enforcing the arbitration agreement, or as governing claims not subject to arbitration. *Singh*, 67 F.4th at 563. A forum selection clause generally does not waive the right to arbitrate unless it expressly forecloses arbitration. *See Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 103 (3d Cir. 2018) ("[H]ad J.P. Morgan wanted Reading to waive its right to arbitrate, it should "have made a reference to arbitration" in either the waiver provision or forum-selection provisions of the broker-dealer agreements.").

Here, the parties dispute how to reconcile Paragraphs 11 (the "forum selection clause") and 12 (the "arbitration clause") of the 2013 License Agreement[4]. At first glance, the provisions appear to directly conflict: Paragraph 11 provides that actions arising out of the Agreement must be brought in the state and federal courts of New Jersey, while Paragraph 12 provides that disputes relating to the Agreement—including its interpretation and alleged breach—are subject to arbitration. (D.E. 1 at 47–48.) Paragraph 12 also states that the New Jersey state and federal courts are the exclusive forums for the entry and enforcement of any arbitration award. (*Id.*) However, the clauses can be harmonized. The arbitration clause itself contemplates a judicial forum by providing that New Jersey state and federal courts are the exclusive forums for entry and enforcement of any arbitration award[5]. (*Id.*) Read together, the most reasonable construction is that the forum selection clause identifies the proper venue for court proceedings ancillary to arbitration (including the present Motion to Compel), and for any claims that are not subject to arbitration, while the arbitration clause governs resolution of the merits of arbitrable disputes through the arbitration process. This interpretation gives effect to both provisions and preserves the Agreement's unambiguous commitment to arbitration.

[4] The parties do not dispute the validity of the 2013 License Agreement. However, CDK contends that the 2024 Agreement supersedes all prior agreements between the parties. (D.E. 20 at 18–21.) While CDK correctly notes that the 2024 Agreement is silent as to arbitration and states that it supersedes all previous agreements between the parties, New Jersey law provides that a later contract does not supersede an earlier one unless both address the same subject matter. *Field Intel. Inc v. Xylem Dewatering Sols. Inc*, 49 F.4th 351, 358 (3d Cir. 2022) (quoting *Rosenberg v. D. Kaltman & Co.*, 101 A.2d 94, 96 (N.J. Super. Ct. Ch. Div. 1953)). Here, the 2013 Agreement pertains to ProQuotes' software licensing services, while the 2024 Agreement is about its forms processing services. (D.E. 1 at 42–48, 89.) Although both contracts involve ProQuotes' forms-mapping software, the "same subject matter" inquiry turns on what each agreement governs, not merely the product referenced. *See Field Intel. Inc*, 49 F.4th at 358. The 2013 License Agreement addresses the rights ProQuotes granted CDK to use the software, whereas the 2024 Agreement addresses CDK's right to receive ProQuotes' forms-mapping services performed using that software. Accordingly, CDK's argument that the Motion to Compel should be denied on this basis fails.

[5] The arbitration clause identifies this Court or the courts of Morris County, New Jersey as holding exclusive jurisdiction to enter and enforce any arbitration award.

CDK raises several objections against this harmonized reading of the forum selection and arbitration provisions, but none is persuasive. First, CDK contends the Agreement establishes a one-way arbitration model, meaning that claims against CDK must be litigated while claims against ProQuotes must be arbitrated. (D.E. 20 at 16.) CDK further argues that construing the provisions to permit arbitration would effectively nullify the forum selection clause, and that because the arbitration clause specifies New Jersey courts as the forum for entry and enforcement of an award, the forum selection clause must serve a different purpose. (*Id.* at 16–17.) That argument fails because the provisions can be reconciled without rendering any language superfluous: the forum selection clause reasonably governs arbitration-related judicial proceedings and any non-arbitrable claims, while the arbitration clause governs the merits of arbitrable disputes. Nor do the clauses contain the asymmetrical language necessary to create a one-way arbitration obligation. *See Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 180 (3d Cir. 1999). In any event, because both parties are commercial entities, the relevant inquiry is whether the Agreement clearly and unambiguously reflects an intent to submit disputes to arbitration—which it does. *GAR Disability Advocs., LLC v. Taylor*, 365 F. Supp. 3d 522, 531 (D.N.J. 2019).

Second, CDK argues ProQuotes waived any right to arbitrate by filing its Complaint and purportedly acting inconsistently with an intent to arbitrate. (D.E. 20 at 28–34.) Waiver turns on the party's conduct and whether it knowingly relinquished the right to arbitrate by acting inconsistently with that right. *Valli v. Avis Budget Grp. Inc*, 162 F.4th 396, 406 (3d Cir. 2025) (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022)). Courts have found waivers when a party litigates on the merits, such as filing dispositive motions without invoking arbitration, engaging in significant discovery, and actively litigating the case for a substantial amount of time. *Parkin v. Avis Rent A Car Sys. LLC*, 774 F. Supp. 3d 707, 712 (D.N.J. 2025); *SuperMedia v.*

*Affordable Elec., Inc.*, 565 F. App'x 144, 147 (3d Cir. 2014); *Coronel v. Bank of Am., N.A.*, No. 19-8492, 2022 WL 3443985, at *5 (D.N.J. Aug. 17, 2022). None of that occurred here. ProQuotes promptly moved to compel arbitration—approximately two months after filing the Complaint—and no substantive merits briefing or discovery took place in the interim. (*See* D.E. 1, 14.) ProQuotes therefore did not waive arbitration by initiating this action. Rather, it filed in the contractually designated forum to seek arbitration-related relief consistent with the parties' agreement.

Finally, CDK asserts that if factual issues concerning the existence of an arbitration agreement are disputed, the Motion must be denied in favor of court-supervised discovery. (*Id.* at 21–28.) That contention is moot because as explained above, the 2013 License Agreement's commitment to arbitrate is unambiguous, so there is no need for discovery on the existence or validity of an arbitration agreement. Accordingly, ProQuotes' Motion to Compel is granted and CDK's Motion for a Preliminary Injunction to Enjoin Arbitration[6] is denied.

B. <u>CDK's Motion to Partially Dismiss the Complaint</u>

CDK has moved to dismiss Counts I, IV, V, and VI of the Complaint, which assert breach of contract and copyright infringement claims. (D.E. 16-1 at 6–7.) As a threshold matter, this Court will not reach the merits of the copyright infringement claims (Counts IV, V, and VI) because those claims arise from the 2013 License Agreement and must be resolved in arbitration.[7]

---

[6] This Court need not address the factors for consideration of a preliminary injunction, as this Court has concluded that the agreement to arbitrate is valid.

[7] Although CDK raises statute of limitations defenses to the copyright claims, those defenses go to the merits of the underlying claims—not the gateway questions of arbitrability—and therefore must be decided in arbitration. *NJM Ins. Co. v. Crete Carrier Corp.*, No. 19-4587, 2020 WL 468395, at *2 (D.N.J. Jan. 29, 2020). Additionally, although the DMCA claim (Count VII) is not part of CDK's Motion to Partially Dismiss, it must also be resolved in arbitration as it relates to the copyright infringement claims and the 2013 License Agreement. (Compl. ¶¶ 185–194.)

This Court will proceed on the merits of the breach of contract claim regarding the 2007 Agreement (Count I.)

i. Whether CDK is Bound by the 2007 Agreement

A signed copy of the 2007 Agreement cannot be located by either party[8]. Under Illinois law, a party may assent to a contract's terms through its acts and conduct even in the absence of an executed copy. *Landmark Props., Inc. v. Architects Int'l-Chicago*, 526 N.E.2d 603, 606 (Ill. App. Ct. 1988). The relevant inquiry is whether the party's conduct objectively manifests agreement to the specific terms at issue, such that the party reasonably should know the other side may infer assent from that conduct. *Gaines v. Ciox Health, LLC*, 264 N.E.3d 1027, 1038 (Ill. App. Ct. 2024) (citing *Arbogast v. Chicago Cubs Baseball Club, LLC*, 194 N.E.3d 534, 542 (Ill. App. Ct. 2021)). Written communications referencing and adopting the contract terms may thus establish assent. *Id.*

Here, the parties referenced the 2007 Agreement in emails in 2020, "[N]ot the signed copy but this is what we signed", and attaching the operative agreement—confirming both that an agreement was executed and that the attached document accurately reflects the signed contract. (D.E. 1 at 66.) Those communications also demonstrate recognition of the contract's existence and terms, and Illinois courts hold that a party who acknowledges a contract's validity through subsequent conduct, including written acknowledgements, may be bound even absent a signature. That the email was sent by Watson, who negotiated the 2007 Agreement, further supports the conclusion that CDK objectively manifested assent to the Agreement's terms. (Compl. ¶ 135.)

[8] The 2007 Agreement states that it is governed by Illinois law.

Accordingly, although an executed copy cannot be located, the 2007 Agreement is valid and binding on the parties.

CDK argues that the 2007 Agreement is not binding because it was signed by ADP, CDK's predecessor. (D.E. 16-1 at 13–14.) On a 12(b)(6) motion, a court may consider public records, including judicial proceedings, in addition to the complaint. *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). Here, CDK has previously represented in multiple actions in this District that it is the successor-in-interest of ADP Dealer Services, Inc[9]. *See CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, No. 15-3103, 2025 WL 842281, at *1 n.1 (D.N.J. Mar. 18, 2025); *CDK Glob., LLC v. Midwest Truck Sales, Inc.*, No. 16-2575, 2017 WL 838800, at *1 (D.N.J. Mar. 3, 2017). Those previous representations undermine CDK's contrary position here. Additionally, at the motion to dismiss stage, this Court must construe the facts in the light most favorable to ProQuotes. In this instance, CDK is considered ADP's successor-in-interest, and the 2007 Agreement is binding on CDK.

ii. Whether the Breach of Contract Claim Is Time-Barred Under the Applicable Statute of Limitations

When a monetary obligation is due in installments, a separate cause of action arises on each installment and the statute of limitations runs separately from the date each installment becomes due. *Light v. Light*, 147 N.E.2d 34, 37 (Ill. 1957). Likewise, because each breach of a continuing duty has its own accrual date, a plaintiff may recover for breaches occurring within the limitations period even if earlier breaches fall outside it. *Foster v. Mitsubishi Motors N. Am., Inc.*, 83 N.E.3d

[9] CDK attempts to distinguish ADP Dealer Services, Inc. from ADP, Inc., the parent entity that encompassed the dealer services business. However, this District has also described ADP Dealer Services as a "successor-in-interest" of ADP, Inc. in connection with a contract dispute. *ADP Dealer Servs., Inc. v. S. California Fleet Servs., Inc.*, No. 13-00334, 2014 WL 1494560, at *1 (D.N.J. Apr. 16, 2014).

390, 395 (Ill. App. Ct. 2016) (quoting *C-B Realty & Trading Corp. v. Chicago & N. W. Ry. Co.*, 682 N.E.2d 1136, 1140 (Ill. App. Ct. 1997)). For written contracts, the statute of limitation is ten years. 735 Ill. Comp. Stat. § 13-206 (2007).

Here, the 2007 Agreement required CDK to pay ProQuotes for a minimum of 300 forms per month, creating a recurring monthly payment obligation regardless of whether CDK had 300 forms that needed programming. (Compl. ¶ 22.) Each month CDK failed to pay the contractual minimum constituted a separate breach, triggering a new limitations period for that month's unpaid installment. Although CDK fell short of the monthly minimum for extended periods and ProQuotes did not file suit until 2025—years after the earliest alleged breaches—the statute of limitations does not entirely bar the breach of contract claim. Rather, it limits ProQuotes' recoverable damages to breaches occurring within the ten-year period preceding the filing of the Complaint.

iii. Issue of waiver

Under Illinois law, waiver is the voluntary and intentional relinquishment of a known right, either expressly or by conduct inconsistent with an intent to enforce that right. *Wells v. Minor*, 578 N.E.2d 1337, 1346 (Ill. App. Ct. 1991). Because waiver turns on a party's subjective intent, it is generally a question of fact and thus inappropriate for resolution at the motion to dismiss stage[10]. *Textron Fin.-New Jersey Inc. v. Herring Land Grp., LLC*, No. 06-2585, 2012 WL 1079613, at *16 (D.N.J. Mar. 30, 2012).

[10] Although the 2007 Agreement is governed by Illinois law, whether a federal court can consider the issue of contractual waiver at the motion to dismiss stage is a procedural issue, requiring the application of federal procedural law. *See Victory v. Manning*, 128 F.2d 415, 416 (3d Cir. 1942).

Here, CDK argues that ProQuotes waived the minimum monthly requirements provision of the 2007 Agreement by waiting years to sue despite CDK's alleged multi-year breaches. (D.E. 16-1 at 17–19.) But each missed installment constitutes a separate breach, further underscoring why the issue of waiver cannot be resolved at this stage: establishing that ProQuotes intended to waive each distinct breach is a very fact-intensive inquiry. Accordingly, CDK's Motion to Partially Dismiss the Complaint is denied, and Counts IV, V, and VI are reserved for arbitration.

C. ProQuotes' Motion to Dismiss CDK's Counterclaims

In its answer, CDK raised three counterclaims against ProQuotes. (D.E. 15 at 50–63.) The counterclaims center on ProQuotes employee Matthew Islas' access to and viewing of CDK's files and software on CDK computers after the computers were sent to ProQuotes—conduct that led to the basis of the copyright infringement claims against CDK. This Court addresses each counterclaim in turn.

i. Computer Fraud and Abuse Act ("CFAA") Claims

The CFAA was enacted to target computer hackers and to deter conduct analogous to digital "breaking and entering", rather than physical trespass. H.R. Rep. No. 98-894 at 20 (1984). Under § 1030(a)(2)(C), the statute authorizes civil liability for anyone who intentionally accesses a computer "without authorization" or "exceeds authorized access" and thereby obtains information from a protected computer. In assessing whether a person exceeded authorized access, the Supreme Court has rejected a purpose-based theory. *See Van Buren v. United States*, 593 U.S. 374, 396 (2021). Instead, liability under both clauses turn on a "gates-up-or-down" inquiry: a user either is permitted to access the system or parts of it or is not. *Id.* at 376. Accordingly, a person violates the CFAA when he has authorization to access a computer but obtains information

from specific areas—such as files, folders, or databases—that are off limits to him, regardless of whether his motive for obtaining the information is improper. *Id.* at 388.

Here, CDK's CFAA theory fails at the threshold because ProQuotes' access was authorized. CDK alleges that ProQuotes violated the CFAA when Islas accessed files on CDK's computers, discovered the ProQuotes software, and recorded his findings. (D.E. 15 at 50–52.) But CDK concedes that ProQuotes and its employees were authorized to access CDK's systems to perform forms programming services. (*Id.* at 46.) CDK's computers were necessary to complete that work, and CDK itself sent the laptops to ProQuotes when the forms programming work picked back up. (*Id.*) ProQuotes' access privileges extended to the folders and files at issue—ProQuotes did not "hack" into those areas to reach them.

CDK's attempt to recharacterize the authorized access is unavailing. CDK asserts that ProQuotes was permitted to use only the specific areas of the computer needed for forms programming, but the credentials and laptops CDK provided gave ProQuotes direct access to the file directory and the relevant folders. (*Id.*; D.E. 30-1 at 16.) Even if CDK could rely on a purpose-based limitation to argue that ProQuotes exceeded its authorization, CDK's claim that the legal notice on its computer put ProQuotes "on notice" that it lacked the rights to access certain areas of CDK's systems is unpersuasive. (D.E. 15 at 47, 51–52.) A violation of an internal use policy or an employer instruction does not create CFAA liability. *NRA Grp., LLC v. Durenleau*, 154 F.4th 153, 167 (3d Cir. 2025) ("[T]he *Van Buren* Court cautioned that a mere violation of a workplace computer-use policy should not create a claim under the CFAA, as doing so 'would attach criminal penalties to a breathtaking amount of complacent computer activity.'")

CDK's second CFAA claim fails for the same reason: it relies on the premise that ProQuotes lacked authorization. § 1030(a)(5)(C) prohibits intentionally accessing a protected computer "without authorization" and thereby causing damage and loss. 18 U.S.C. § 1030(a)(5)(C). An individual is authorized to access a computer when the employer has approved or sanctioned his possession of and admission to the computer. *United States v. Eddings*, 161 F.4th 199, 205 (3d Cir. 2025) (quoting *NRA Grp.,* LLC, 154 F.4th at 168)). Similar to the "exceeds authorized access" clause, courts reject a purpose-based inquiry into whether the access was without authorization. *Van Buren*, 593 U.S. at 376. Here, the parties do not dispute whether CDK gave the computers at issue to ProQuotes or that ProQuotes had access to the relevant files and folders. For purposes of the CFAA, it is immaterial whether ProQuotes was instructed or understood that it should not access the computers beyond the scope of its assigned tasks—the "gates-up-or-down" inquiry only asks whether the user was permitted to access a specific device or computer. Because ProQuotes had authorization to access the files and folders at issue, this claim also fails.

ii. Stored Communications Act ("SCA") Claims

The SCA was enacted to protect information stored by centralized communication providers. *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 147 (3d Cir. 2015). To state a claim under the SCA, a plaintiff must allege that the defendant either (1) intentionally accessed without authorization a facility through which an electronic communication service is provided, or (2) intentionally exceeded authorization access to that facility and thereby interfered with authorized access to an electronic communication. *Id.* at 145–146. Importantly, "facility" refers to the service provider's infrastructure—where providers store private communications—such as telephone companies' or Internet providers' servers, not an end user's

personal computing device. *Id.* at 146–147 (quoting *Garcia v. City of Laredo, Tex.*, 702 F.3d 788, 792 (5th Cir. 2012)); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 277 (3d Cir. 2016). Courts therefore construe the SCA narrowly to reach communications stored at provider facilities, not data or software stored on individual users' machines.

Here, CDK alleges ProQuotes violated the SCA by exceeding its authorization to access CDK's customer relationship management software—the ClarifyCRM ("CRM")—which purportedly contains electronic communications between CDK's dealership clients and their customers. (D.E. 15 at 53–54.) This theory fails because the CDK computers hosting the CRM software are personal computers, not SCA-protected "facilities." The communications CDK seeks to protect are not alleged to have been accessed on service-provider infrastructure. Instead, CDK's allegations concern access to software and data on end-user machines. The SCA's reach is limited to preventing unauthorized access to provider-side storage—consistent with its focus on "remote computing operations and large data banks that stored emails"—not access to information residing on individual computers. *In re Google*, 806 F.3d at 145.

iii. California Penal Code Claims

To state a claim under any subsection of California Penal Code § 502, also known as the Comprehensive Computer Data Access and Fraud Act ("CCDAFA"), a plaintiff must plead both (1) knowing access to a computer, computer system, network, or data and (2) specific unauthorized conduct after that access. *Joseph Oat Holdings, Inc. v. RCM Digesters, Inc.*, 409 F. App'x 498, 504 (3d Cir. 2010) (quoting *Facebook, Inc. v. ConnectU LLC*, 489 F. Supp. 2d 1087, 1091 (N.D. Cal. 2007)). The dispositive issue under § 502(c) is whether the defendant was authorized to

access the relevant computer or server, not merely whether the defendant owned the system. *See id.*

Here, CDK alleges that ProQuotes violated the CCDAFA by knowingly accessing and using CDK's computers without permission to conduct an unauthorized investigation and to record an unauthorized video of the computer and its contents, which included internal confidential information. (D.E. 15 at 57–58.) That assertion fails to state a claim under § 502(c) because it does not plausibly allege that ProQuotes lacked authorization to access the CDK computers or the software on them. To the extent CDK contends ProQuotes was prohibited from accessing specific portions of the system, CDK does not specify what those portions were, and that omission is fatal to its § 502(c) claims. Even if CDK had adequately alleged that certain areas were off limits, CDK still fails to plead how ProQuotes would know of any applicable use restrictions. (D.E. 15 at 57.) Accordingly, ProQuotes' Motion to Dismiss CDK's Counterclaims is granted, with leave for CDK to amend.

## IV. CONCLUSION

For the foregoing reasons, ProQuotes' Motion to Compel Arbitration is **GRANTED** and its Motion to Dismiss CDK's Counterclaims is **GRANTED WITHOUT PREJUDICE**. CDK's Motion for a Preliminary Injunction to Enjoin Arbitration is **DENIED** and its Motion to Partially Dismiss the Complaint is **DENIED**, with Counts III, IV, V, VI, and VII reserved for arbitration. An appropriate order follows.

/s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk
cc: Parties
James B. Clark, U.S.M.J.